CARROLL v. THE INTER-STATE RAPID TRANSIT COMPANY, *Appellant.*

DIVISION ONE.

1. **Practice:** DEMURRER TO EVIDENCE. Whether the showing made by plaintiff with every favorable inference therefrom tends to support the issues on his behalf, is a question for the court. If the latter finds that it does not, it is error to submit the case to the jury.

2. **Railroad:** PASSENGER: CONTRIBUTORY NEGLIGENCE. Plaintiff boarded an elevated steam railway car in motion, by getting on the sheet-iron covering of the steps of the last platform on the train, and kept himself in that position by holding to the iron gate that barred entrance there, until struck by a structure near the track and knocked into the street below. *Held*, in the circumstances detailed in the opinion that he was negligent, as a matter of law.

3. ——: ——: ——: DANGEROUS POSITION. A railway company is not liable for failure to take steps to avert injury from one who has placed himself in danger, where it has not omitted to discharge any duty towards such person.

4. ——: ——: ——. Where a passenger, without the consent of the carrier, selects a place to ride, which is obviously not intended for that purpose, and is hurt by reason of hazards peculiar to that position, he has no cause of action.

| 107 | 653 |
| 123 | 137 |
| 107 | 653 |
| 141 | 96 |
| 142 | 554 |
| 107 | 653 |
| 168 | ³312 |
| 107 | 653 |
| 101a | ⁵190 |
| 107 | 653 |
| 179 | ²678 |

5.  **Practice in Supreme Court:** REVERSING JUDGMENT WITHOUT
    REMANDING.  Where it appears that in every view of the facts,
    plaintiff has no right of action whatever, it is proper to reverse a
    judgment for him without remanding the cause for a new trial.

*Appeal from Cass Circuit Court.*—HON. CHAS. W.
SLOAN, Judge.

REVERSED.

THIS is an appeal from a judgment for plaintiff for
$3,208.41, entered upon a verdict in the circuit court of
Cass county. After the usual motions and exceptions
the defendant appealed. The action is for personal
injuries.

The defendant company was operating an elevated
railway line in Kansas City, Missouri, extending thence
a short distance into the state of Kansas. On this line
defendant ran passenger cars, and exercised the vocation
of a common carrier. The place where the plaintiff's
mishap occurred was near the James street station on
that line; the time, October 20, 1886.

Plaintiff and his brother came to that station after
dark on the evening in question to take passage on one
of defendant's trains. The brother succeeded in getting
aboard at the usual entrance for passengers. The
plaintiff did not; but he attempted to attach himself to
the outer side of the gate and sheet-iron covering,
closing the steps of the rear platform of the last car, as
the latter passed him in motion, and so far succeeded,
that he was hanging on there when the train passed a
structure of the Armour Packing Company, which stood
near the track, and swept him from his position into
the street, some twenty or twenty-five feet below, inflict-
ing serious injuries. This structure, or "cattle chute,"
was within a distance of two hundred and thirty or two
hundred and forty feet from the station, according to
plaintiff's witnesses, and within six inches of the
passing cars.

The material portions of the testimony given by plaintiff's brother (referred to in the opinion.) are as follows : "When I got on the car the conductor upbraided me. He spoke rather sharp and cross about me getting on. He said, 'You are liable to get hurt because you were getting on a moving train,' he scolded me because I tried it. We both went into the car. I took my seat near the door. He collected the fare from me. After we got a little piece, and the conductor was collecting the money from me, Mr. Anderson, who had his head out of the window, pulled it back and said, 'There is a man hanging on behind.' It startled me to hear it ; at the same time I supposed it would be natural enough for a man to be on the rear end of the car. I did not know the condition of the cars. I had not observed that. He says, 'He has got a lamp in his hand.' Mr. Anderson seemed to be rather excited about it. When he told the conductor that this man was hanging on, the conductor was making my change and says that, 'If the stock-drive hits him he will get off.' The conductor said that while he was collecting my fare. As he mentioned the stock-drive Rotert says, 'Look out for your arms.' Mr. Anderson was looking out of the window, and Mr. Rotert says, 'Look out for your arms,' then he pulled back his arm. After we passed the cattle-drive Mr. Anderson looked out and says, he is off.' At that the conductor passed through the cars at the rear end of the rear car and looked out. It was after the train had passed it. I don't know whether Mr. Anderson could see or not, I should think he could. It was a distance of forty or forty-five feet from where Mr. Anderson sat to the rear of the platform. With his head out of the window he could see that distance on the curve. There was a sharp curve there, and I suppose he could see the rear end of the rear car, although he was in the front coach. I said nothing at the time Anderson made the remark, but sat still. I didn't think at the time it was my brother ; had no idea

he was hanging on there.   I thought probably he would come on the other train ; I had a notion to wait for it myself.   I sat there with no notion that there was a man hanging on. I didn't say a word. I knew my brother had no lamp, and consequently didn't think this man could be him.   I sat there perfectly indifferent.   I didn't think it was my brother there.   I thought it was a trainman with his lamp.   *Nothing suggested to my mind that anyone was in danger at the time.*   I went on to Mulberry street some blocks above, at the terminus of the road at that time.   I waited for my brother to come there, supposing he was on the other car.   He didn't come, and I went to the union depot ; waited for him there about half an hour, and while waiting there the conversation that took place in the car came to my mind.   I became alarmed that it might have been he that was on behind and have met with an accident. I went over to the drug store and telephoned to see if there had been an accident, and found that there had been.   I went home and found my brother there and the surgeon dressing his wounds."

All other essential facts are mentioned in the opinion of the court.

*Warner, Dean & Hagerman* for appellant.

(1)   Where the facts and the inference to be drawn from them are undisputed, it is the duty of the court to declare whether they establish or do not establish negligence.   If in a personal injury case like that under consideration, the facts and the inferences to be drawn from them fail to establish the allegations of negligence in the plaintiff's petition, then it is the duty of the court to declare that negligence is not established.   In like manner, if the undisputed facts and the inferences to be drawn from them show that the plaintiff's negligence concurred in bringing about the injury, then the court should declare, as a matter of law, that the plaintiff's

contributory negligence prevents recovery. *Weber v. Cable Co.*, 100 Mo. 194; *Barton v. Railroad*, 52 Mo. 253; *Lenox v. Railroad*, 76 Mo. 86; *Fletcher v. Railroad*, 64 Mo. 484; *Callahan v. Warne*, 40. Mo. 13; *Powell v. Railroad*, 76 Mo. 80, and cases cited; *Zimmerman v. Railroad*, 71 Mo. 491; *Malone v. Railroad*, 64 Mo. 267. See also authorities cited under points 2 and 3, *post.* (2) The specified acts of negligence must be the proximate cause of the injury or there can be no recovery. The first four alleged acts of negligence of defendant, namely: *First.* Failure to provide lights at station. *Second.* Failure to stop train sufficient length of time. *Third.* Covering the steps and closing the gate of the rear platform of the car. *Fourth.* Running the railroad in proximity to the upright timbers of the hog chute, were not the proximate cause of the injury. *Stepp v. Railroad*, 85 Mo. 229; *Harlan v. Railroad*, 65 Mo. 22; *Powell v. Railroad*, 76 Mo. 233; *Waldhier v. Railroad*, 87 Mo. 37; *Nelson v. Railroad*, 68 Mo. 593. (3) The plaintiff's act in attempting to get on the train and riding swinging to the platform, as shown by the undisputed evidence in this case, in consequence of which he wa.; injured, was the plainest kind of negligence on his part, and prevents recovery. *Weber v. Cable Co.*, 100 Mo. 194; *Harvey v. Railroad*, 116 Mass. 269; *Solomon v. Railroad*, 103 N. Y. 437; *Railroad v. Scates*, 9 Cent. Law Journal, 167; *Phillips v. Railroad*, 49 N. Y. 177; *Nelson v. Railroad*, 68 Mo. 593; *Strauss v. Railroad*, 75 Mo. 185; *Knight v. Railroad*, 23 La. Ann. 462; *Harlan v. Railroad*, 65 Mo. 22. (4) The fifth specification of negligence or failure of conductor to stop train after it had started is not sustained by testimony.

*W. A. Fyke* and *W. S. Shirk* for respondent.

(1) It was defendant's duty to keep its station platform reasonably well lighted, and a failure to do so

constitutes negligence. *Buenemann v. Railroad*, 32 Minn. 390 ; s. c., 18 Am. & Eng. R. R. Cases, 153, and note on 155 and 156, citing a large list of cases from different states ; *Bennett v. Railroad*, 102 U. S. 577; *Stewart v. Railroad*, 2 Am. & Eng. R. R. Cases, 497; *Railroad v. White*, 48 Ark. 495 ; *Railroad v. Arnold*, 35 Am. & Eng. R. R. Cases, 466. ( 2 ) And it was his duty to stop its trains at its depot platforms long enough to enable its passengers to alight from its cars, and those desiring to get aboard to do so, and a failure to do so is negligence. *Railroad v. Rector*, 104 Ill. 296; *Dawson v. Railroad*, 11 Am. & Eng. R. R. Cases, 134; *Strauss v. Railroad*, 75 Mo. 185 ; *Swigert v. Railroad*, 75 Mo. 475 ; *Clotworthy v. Railroad*, 80 Mo. 220. And we might cite a host of other cases, for a fair list of which see note to *Brooks v. Railroad*, 16 Am. & Eng. R. R. Cases, on pages 346–7. ( 3 ) To place a platform and steps upon the rear end of its cars, and then to cover the steps over with sheet-iron, and bar entrance to the platform by an iron gate, in such a manner as would escape the notice of an ordinarily prudent man, under the circumstances of this case, was plainly negligence on the part of defendant. ( 4 ) After defendant's conductor was notified of defendant's perilous position, it was his duty to do all he could, with safety to his train, to avoid injuring plaintiff, and a failure to do so was negligence for which defendant was liable. *Burnham v. Railroad*, 56 Mo. 338 ; *Meyer v. Railroad*, 59 Mo. 223 ; *Bergman v. Railroad*, 88 Mo. 678 ; *Werner v. Railroad*, 87 Mo. 368 ; *Donahue v. Railroad*, 91 Mo. 357. ( 5 ) To construct defendant's railroad, so near to the upright timbers of the cattle chute, that its cars passed within from seven to ten inches of such timbers, was a reckless and dangerous act, and was negligence *per se.* 1 Rohrer on Railroads, pp. 477, 478, and notes 1 and 2, citing 63 Ill. 167 ; *Railroad v. Leonhardt*, 66 Md. 70. And it would have been negligence, in case of the injury of an employe who did not know of the

danger. *Devitt v. Railroad*, 50 Mo. 302. ( 6 ) These acts of negligence on defendant's part were the proximate cause of the accident. *Railroad v. Kellogg*, 4 Otto ( S. C. U. S.) 469 ; Wharton on Neg., sec. 85 ; *Nagel v. Railroad*, 75 Mo. 653 ; *Boggs v. Railroad*, 18 Mo. App. 274 ; *Waldhier v. Railroad*, 87 Mo. 37 ; *Dunn v. Railroad*, 21 Mo. App. 188. ( 7 ) It was not negligence *per se* for plaintiff to attempt to get aboard a moving train. Whether it was negligent or not, depends upon the speed with which the train was moving. If it was moving so slowly that a man of ordinary prudence would not hesitate to attempt to get aboard, then plaintiff's attempt was not negligent. And this is a question for the jury. And this question having been submitted to the jury, by proper instructions, and passed upon in the plaintiff's favor, it must be regarded as conclusively established that the plaintiff was not guilty of contributory negligence. *Swigert v. Railroad*, 75 Mo. 475 ; *Leslie v. Railroad*, 88 Mo. 50 ; *Fortune v. Railroad,* 10 Mo. App. 252 ; *Taylor v. Railroad*, 26 Mo. App. 536 ; *Nance v. Railroad*, 26 Am. & Eng. R. R. Cases, 223. ( 8 ) It was not error to permit the witness Williams to testify as to the distance within which defendant's train, running at a given rate of speed, could be stopped. Rogers on Exp. Test., secs. 107, 108, and authorities cited ; *Greenwell v. Crow*, 73 Mo. 638 ; *Eyerman v. Shehan*, 52 Mo. 221. ( 9 ) Plaintiff, under the circumstances, was a passenger. Hutchinson on Carriers, secs. 554–5–6 ; 37 Iowa, 264 ; 40 Barb. 546 ; 68 N. Y. 306 ; *Smith v. Railroad*, 32 Minn. 1.

BARCLAY, J.—At the trial the defendant insisted that the testimony did not warrant the submission of the case to the jury, because it disclosed plaintiff's own negligence, as a clear conclusion of law, in the premises. But that objection was overruled, and an instruction in the nature of a demurrer to the evidence was refused.

I.   This  presents the first point for decision.   The rule governing its consideration is well understood.

It is  for  the court  to say,  in the  first instance, whether the showing made by the plaintiff (with every reasonable inference therefrom, favorable to him) legitimately tends to support the issues on his behalf.   If the court so holds, it is for the triers of fact then to respond whether or not that showing is satisfactory and convincing to establish the truth of the facts upon which the submitted case rests.

In the  present action the  question  must be determined whether plaintiff exercised ordinary care for his own safety ; or, to put the statement into a somewhat more practical form, whether his conduct in the opinion of the court, was such as a person of ordinary prudence and caution, in the same circumstances, would have exhibited, according to the usual and general experience of men.   It is for the court to declare whether the evidence tends to establish such care on his part. If no reasonable view of the testimony will justly permit that inference then it was error in the trial judge to submit that question to the jury.

The law of negligence does not differ substantially from that on other topics in this regard.   It is the province of the court generally to determine whether testimony tends to prove a disputed fact.   It is, afterwards, for the jury to determine whether it does prove it.

To ascertain whether plaintiff's evidence has any fair tendency to show that he used ordinary prudence on the occasion in question, it is necessary to go into some details of the case.

As a witness at the trial, plaintiff testified that he and his brother started from the home of the latter to go to the union depot.   They went to the elevated station at James street to take defendant's line of cars. It was dark, between seven and eight o'clock P. M.   The train was already there when they arrived.   It consisted

of a locomotive and two passenger coaches. The sta-
tion and surrounding platform were not illuminated,
but there was an electric light in the street near by and
the passenger cars were lit as usual. Plaintiff's brother
was ahead of him and managed to get upon the train
while in motion, and took a seat in the forward car.
When the hind car came along, plaintiff undertook to
get upon its rear platform. He was carrying a paper
box containing a dozen wine glasses. The steps of this
car platform were covered with sheet-iron, and there
was a gate ( two feet and eight inches high ) in position
on the platform proper, to prevent entrance by that way.
Plaintiff put the box of glasses over the gate, upon the
steps. They were afterwards found there uninjured.
After twice slipping in his effort to gain a foothold on
the sheet-iron, covering the steps, he got hold of the
gate, and thus supported was able to stand on the
covering and to maintain that position as the train left
the station, and moved on until he was struck by the
cattle chute and knocked off. He declares that owing
to the insufficiency of light he did not see the gate
until the car had passed beyond the depot platform ;
but when asked categorically on cross-examination,
" How did you get that box over ?" replied, " That is
something I cannot tell." He also said that if he had
known that the gate was closed and the sheet-iron there
he would not have attempted to get on. He admitted
having grasped the handle or rail at the side of the
rear platform before he tried to obtain a foothold, and
that he made two ineffectual attempts to stand there,
before he succeeded. He did not know of the existence
of the cattle chute, and was generally unfamiliar with
defendant's road, being a stranger in Kansas City ; but
he had previously been a passenger on elevated rail-
ways in New York.

We do not purport to give a full outline of his tes-
timony, but merely such parts of it as form the basis of
the conclusion we shall announce.

The defendant's passenger station and the railway itself were erected at such a height above the ground as made it a hazardous undertaking to attempt to board a car there while in motion, even if the steps and platform thereof were as open as those of surface railways usually are. Steam was the motive power in use on defendant's road. The instances are, at best, exceptional in which an attempt to board a moving steam railway coach can be viewed as consistent with ordinary care. They are still more exceptional in which an effort to board an elevated passenger train in motion can be so held.

The plaintiff was certainly bound to use his eyes before he attempted to enter the car at any point. It is not satisfactory to assert (as an excuse for not doing so) that the station was dark and illy lighted, considering the other facts in evidence here. The lights inside the car were burning, and plaintiff could not have placed his paper-box of wine glasses over the gate in a position of safety on the car steps (inside the sheet-iron covering), without sufficient view and notice of the real condition of things to put him on his guard. That condition was, of itself, a most emphatic warning to him, as to all other persons, that ingress to the car at that point was prohibited; and when he observed that the car steps were covered and closed, so that his foot slipped off at his first attempt to get upon them, his attention was necessarily still more directly drawn to the barrier placed there to prevent an entrance. His persistency thereafter, in view of the state of affairs open to his immediate observation, was at his own risk. We think the court should have so told the jury.

No other reasonable inference can be drawn, from the admissions of the plaintiff himself, than that his action in the circumstances was such as no person of ordinary prudence and caution, in the same situation, would have taken.

II. But it is next claimed that the conductor of defendant's train might have averted plaintiff's injury

by the exercise of proper care after the perilous position of the latter was discovered.

This contention rests on the evidence of the plaintiff's brother, touching what took place in the car after he entered. Its substance appears in the statement accompanying the opinion. From it we clearly see that the brother, who heard all that the conductor heard, and might naturally be expected in the circumstances to be more keenly alert on such a subject than the latter, had no idea that the plaintiff was in peril.

Moreover the cattle chute was not over two hundred and forty feet distant from the James street station, and, at the rate of ten miles an hour, would be reached by plaintiff in his dangerous position, within less than twenty seconds after leaving that station. At that speed (the usual one) the train could be stopped within one hundred feet, but how long the interview, narrated by the brother lasted, does not appear. It closed just as the train passed the stock-drive or "chute," it seems.

The statement of Anderson that a man was on the end of the car was followed by the remark that he had a lamp. From which it would naturally be inferred that the man was some train employe in the performance of his duty, not some other person in danger, as later proved to be the fact.

We see nothing in this evidence to warrant an inference of want of care on defendant's part with regard to discovering the peril of plaintiff, or justifying the application of the principle that might have come into play in the case, had notice of his danger been given in season to avert the calamity.

III. The dangerous proximity of defendant's elevated railway to the cattle chute of the packing company is next suggested as constituting actionable negligence on defendant's part. Had the position occupied by plaintiff on the train been intended or sanctioned for the use of passengers; this contention

would command serious consideration ; but it was obviously not.   As we have seen the place bore at every point clear indications that riding there was forbidden.   No written or printed notice could have given plainer warning to that effect, than the gate and covered steps themselves.   There is absolutely nothing in the case indicating defendant's consent to transport him there.   His injury is directly traceable to the extra hazard of the position he voluntarily took, contrary to the evident intention, practice and warning of the carrier.   He, therefore, must be held to have assumed the risks to be met in riding as he did.

The unfortunate accident grew out of plaintiff's lack of knowledge of any such danger as the cattle chute created.   But for that obstacle he might possibly have been safely carried to the next station, despite his novel selection of a place to ride.   But he cannot justly charge upon defendant the responsibility for his want of knowledge of his surroundings in a strange city.

However much his case may command the sympathy of all right-feeling men, it creates no legal liability on defendant's part to indemnify him for the consequences of neglect of ordinary care for his own safety.

The trial court should have declared that upon the evidence plaintiff had no cause of action.

In view of this conclusion, upon which we all entertain no doubt, it is not necessary to discuss any of the other questions raised.

IV.   My associates entertain a positive opinion that where ( as here ) it appears that, in every view of the facts, plaintiff has no right of action whatever, the cause should not be remanded for a new trial upon the reversal of an erroneous judgment.   Many cogent reasons, no doubt, can be given for that opinion, and it has the sanction of precedents, extending through many years.   My personal impression has been that, where the trial court in an action at law, refuses to

nonsuit, and we conclude that its ruling in that regard is erroneous, the cause should, on a reversal of the judgment, be remanded so that plaintiff might, if so advised, dismiss his action, or take a voluntary nonsuit, and thus avoid such effects as might possibly be held to flow from a plain judgment of reversal. Plaintiff would have the right to take such course in the circuit court before the latter could properly enter a final judgment against him (R. S. 1889, sec. 2084; *Lawrence v. Shreve* (1858), 26 Mo. 492); and the reviewing power of this court extends no further in actions at law, than to pronounce such judgment as the trial court "ought to have given." R. S. 1889, sec. 2304. But this view of the subject has not met the approval of my colleagues and the point involved is not such as seems to demand further persistency on my part to maintain an individual opinion.

Accordingly, the judgment of the circuit court is reversed, with the concurrence of all the judges of this division.